**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| U-FUEL, INC. (NV) | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | |
| HIGHLAND TANK & | : | |
| MANUFACTURING COMPANY, INC., | : | |
| STEEL TANK INSTITUTE, and | : | |
| MODERN WELDING COMPANY OF | : | NO. 02-2723 |
| OHIO, INC. | : | |
| | : | |
| Defendant. | : | |

DuBOIS, J.                                                                November 4, 2002

### MEMORANDUM

**I.    INTRODUCTION**

Plaintiff, U-Fuel, Inc. ("U-Fuel" or "plaintiff") alleges in this patent infringement action that Highland Tank & Manufacturing Company, Inc. ("Highland"), Steel Tank Institute ("STI"), and Modern Welding Company of Ohio, Inc. ("Modern") (collectively, "defendants") infringed U-Fuel's United States Reissued Patent No. 37, 144 (the "'144 patent") by licensing, manufacturing, and selling non-insulated, above-ground storage tanks ("ASTs") and marketing such tanks as "fire-resistant."  U-Fuel, Highland, and Modern manufacture and sell ASTs.  STI is a non-profit trade association whose members include AST manufacturers.  STI's purpose is to promote the use of high-quality steel tanks which are manufactured by its members to meet fire codes and environmental regulations.

Presently before the Court is plaintiff's Motion for a Preliminary Injunction (Document No. 3, filed May 9, 2002), in which plaintiff seeks an order barring defendants from marketing,

selling, offering for sale, distributing, licensing, manufacturing, or using any non-insulated, "fire-resistant" ASTs which infringe the '144 patent. Defendants respond by asserting a number of defenses – prior art inherently anticipates the '144 patent; plaintiff's claim construction violates the written description requirement of 35 U.S.C. § 112; the allegedly infringing activities of defendants are protected under the intervening rights provision of 35 U.S.C. § 252; plaintiff failed to disclose the best mode in making "fire-resistant" ASTs; inconsistent testimony by plaintiff evidences unclean hands; and plaintiff procured the '144 patent through inequitable conduct – warranting the denial of plaintiff's motion.

For the reasons set forth in this Memorandum, plaintiff's Motion for a Preliminary Injunction is denied.

## II.    **PROCEDURAL HISTORY**

U-Fuel filed a Complaint against defendants on May 7, 2002. The Motion for a Preliminary Injunction was filed on May 9, 2002. Defendants responded on June 13, 2002; plaintiff filed a reply on July 17, 2002.

The Court held a hearing on the Motion for a Preliminary Injunction on July 22 through 25, 2002, and granted the parties leave to file supplemental memoranda on the issue of the validity of the reissued '144 patent. Both parties thereafter filed supplemental memoranda. The motion was fully briefed on September 9, 2002.

The Court will now set forth findings of fact and conclusions of law in ruling on plaintiff's Motion for a Preliminary Injunction based on evidence presented at the hearing and the written submissions of the parties.

-2-

III.    **FINDINGS OF FACT**

ASTs are used for industrial and commercial purposes to store combustible and flammable liquids such as gasoline. Because of the inherent safety risks that ASTs pose, private and public entities have promulgated standards for the testing and rating of ASTs. Such private entities include Underwriter's Laboratories, Inc. ("UL"), the National Fire Protection Association ("NFPA"), and Southwest Research Institute ("SwRI").

The "Standard for Steel Aboveground Tanks for Flammable And Combustible Liquids" ("UL 142") was created in 1922 by UL and prescribes the minimum construction standard for single and double wall ASTs.[1] Due to increased demand for ASTs for storing commercial fuel,[2] UL developed an additional performance-based listing, known as the "Standard for Insulated Aboveground Tanks for Flammable and Combustible Liquids" ("UL 2085"),[3] which tested the internal temperature rise of insulated ASTs when subject to an external temperature of 2000 degrees Fahrenheit for not less than two (2) hours. Insulated ASTs are listed as "protected" under UL 2085 if the increase in internal temperature does not exceed 400 degrees Fahrenheit. Non-insulated ASTs are not tested under the UL 2085 standard.

The NFPA is an organization which periodically publishes fire codes and safety use requirements, such as separation distances between an AST and a building, an AST and a public

---

[1] UL 142 is a construction standard, not a standard for "fire-resistance." The construction standard for a double-wall tank was first included in the seventh edition of UL 142, published in 1993. Defs.' Ex. 81.

[2] The demand for ASTs significantly increased after the Environmental Protection Agency finalized its underground storage tank requirements in 1988. Defs.' Ex. 8.

[3] The first issue of UL 2085 was published in 1992. Pl.'s Ex.44.

roadway or other property line, and an AST and a fuel dispenser. Defs.' Ex. 8. Section 2-4.5 of

the NFPA 30A, Automotive and Marine Service Station Code ("NFPA 30A"), created the

standard for "fire-resistant tanks."[4] Under Section 2-4.5(a), an AST is listed as "fire-resistant" if

it prevents: (a) the release of liquid; (b) failure of the supports for the tank; and (c) impairment of

venting for two (2) hours when tested using "a fire exposure that simulates a high-intensity pool

fire, such as that described in UL 2085...or equivalent test procedure." Section 2-4.5(a), NFPA

30A (1996).

In the late 1980's and early 1990's, double wall, non-insulated tanks, constructed in

accordance with UL 142, were manufactured and sold as ASTs.[5] These ASTs were non-insulated

in that the space between the primary and secondary tank was not filled with insulation (usually a

concrete mixture) and they were capable of being monitored for any leakage into this space. Non-

insulated ASTs are lighter than insulated tanks and thus more mobile and easier to transport.

Testimony of R. Michael Webb, July 23, 2002, at 92. In addition, non-insulated tanks cost

approximately fifty percent less than insulated tanks. Testimony of Charles A. Frey, July 24,

2002, at 41-42, 45.

In 1993, STI published the "Standard for Aboveground Tanks With Integral Secondary

Containment" ("F921"), a specification standard for double wall, non-insulated tanks made in

accordance with UL 142. Pl.'s Ex. 35. Thousands of ASTs manufactured to this standard were

---

[4] "[NFPA 30A] shall apply to automotive service stations, marine service stations, service stations located inside buildings, and fleet vehicle service stations." Section 1-1.1, NFPA 30A (1996). Only those tanks that are listed as "fire-resistant" under Section 2-4.5(a) can be used in the areas designated under Section 1-1.1.

[5] Brown Minneapolis Tank began making and selling double wall, non-insulated ASTs in 1988. These tanks received a UL 142 listing shortly thereafter. Defs.' Ex. 10.

sold by STI members during the 1993-1995 period.  Defs.' Ex. 8.  Highland and Modern each

sold their own versions of double-wall, non-insulated tanks that conformed to UL 142 during this

time period as well.  Defs.' Ex. 9; Defs.' Ex. 10.

U-Fuel filed a patent application on January 17, 1996 covering the construction of an

"improved" AST "fabricated from steel plates of minimum thickness, the sheets being made from

a special metal alloy, and the plates welded in a specific way, in order to withstand a 2000° F.

environment for a minimum of two hours." (U.S. Patent No. 5,723,842 (the "'842 patent"),

column 2, lines 41-44).  The '842 patent was issued by the Patent Office on March 3, 1998.

SwRI is an applied research and development non-profit organization which provides

standards and protocols for the testing, listing, and labeling of tanks, including ASTs.  In 1995, U-

Fuel contracted with SwRI to create a testing protocol for its non-insulated ASTs.  In the context

of the contractual arrangement between U-Fuel and SwRI, U-Fuel's President R. Michael Webb

("Mr. Webb") persuaded SwRI to adopt a testing protocol with no internal temperature limits on

the ground that Section 2-4.5 of NFPA 30A imposed no requirements for maximum internal

temperature rise in its definition of "fire-resistant."  This led to the development of testing

protocol 97-04 ("SwRI 97-04") in 1997.  SwRI 97-04, a high-intensity fire exposure, leakage,

and hose stream test, provided a new standard for the industry to test whether a *non-insulated*

AST met the fire-resistant requirements of NFPA 30A; i.e., listed as able to withstand an

environment of 2000° F. for two hours without sustaining any welding failure or leakage.  Prior to

SwRI 97-04, only tanks containing insulation could meet the internal temperature requirements of

UL 2085 and thus be considered "fire-resistant" pursuant to NFPA 30A.

SwRI began testing U-Fuel's tanks pursuant to SwRI 97-04 on April 15-16, 1999.  Due to

-5-

industry-wide acceptance of SwRI 97-04, other tank manufacturers and organizations contacted

SwRI to have their ASTs tested for labeling and listing under this protocol.  STI contracted with

SwRI to conduct an SwRI 97-04 test on one of its F921 tanks.  On May 13, 1999, STI publicly

announced that its F921 tank passed the SwRI 97-04 protocol.  Thereafter, STI adopted the trade

name "Flameshield" for its F921 tanks.  On November 21, 1999, STI issued a press release

reporting that its Board of Directors had authorized the "Flameshield" program and that its

members could officially begin marketing "Flameshield" tanks in early 2000.  Defs.' Ex. 22.

Accordingly, members of STI, including Highland and Modern, began manufacturing and selling

"Flameshield" tanks in early 2000 and continue to do so today.  "Flameshield" tanks are listed as

"fire-resistant" under NFPA 30A and are marketed as such.

After learning about the successful SwRI 97-04 test of STI's F921 tank, U-Fuel notified

SwRI that the SwRI 97-04 testing and certification of tanks of U-Fuel's "competitors" conflicted

with U-Fuel's original '842 patent.  Mr. Webb sent a letter to Gladys Finley of SwRI, dated July

15, 1999, stating that U-Fuel "underst[ood] that Southwest Research Institute has tested and

certified other tanks for our competitors as being Fire Resistant under Test Procedure 97-04.  It is

[our attorneys'] opinion that U-Fuel owns this technology and that it is unlikely that Southwest

Research Institute could perform certification without conflicting with U-Fuel's ['842] Patent ..."

Defs.' Ex. 57.

U-Fuel then filed suit against SwRI on May 3, 2000, alleging, inter alia, misappropriation

of trade secrets; that SwRI wrongfully disclosed to third parties proprietary and confidential

information relating to the technology U-Fuel used in the manufacture of its non-insulated ASTs.

See U-Fuel, Inc. v. Southwest Research Institute, CA. No. 00-480 (W.D. Tex. Dec. 3, 2001).

Specifically, U-Fuel contended that SwRI disclosed information (obtained through U-Fuel's production manual obtained as part of its contractual arrangement with SwRI, and during SwRI's on-site inspections of U-Fuel's manufacturing plants) to U-Fuel's competitors, such as STI, so that they in turn could directly manufacture "fire-resistant" ASTs and become clients of SwRI without entering into licensing agreements with U-Fuel. Id. at 3.

On December 3, 2001, the magistrate judge in the SwRI suit recommended that SwRI's motion for summary judgment with regard to the trade secret misappropriation claims be granted because U-Fuel failed to establish that SwRI wrongfully divulged to third parties any confidential or proprietary information received from U-Fuel; the magistrate judge concluded that it was undisputed that U-Fuel had already provided the same information to third parties and thus, SwRI did not make any "unauthorized" disclosures of U-Fuel's confidential or proprietary information. Id. The district court accepted the magistrate judge's recommendation by order dated January 31, 2002. Defs.' Ex. 17.

Prior to the suit against SwRI, U-Fuel filed a reissue patent application on January 24, 2000, which contained the original claims from the '842 patent and additional method claims specifically referencing non-insulated fire-resistant ASTs. U-Fuel sought a reissued patent on the ground that the original '842 patent was "overly specific" and "partly inoperative because [U-Fuel] claimed less than [it was] entitled to claim." Defs.' Ex. 4; see also Testimony of R. Michael Webb, July 23, 2002, Hearing Tr. at 186. The Patent Examiner originally rejected U-Fuel's additional claims in view of the two UL standards, UL 142 and UL 2085. However, after an interview with representatives of U-Fuel, the Examiner allowed the new claims on the basis that such claims were to be limited to "non-insulated" ASTs, mistakenly noting that the UL standards

were for "insulated tanks" only. Defs.' Ex. 6.[6] The Patent Office issued the '144 patent to U-Fuel on April 24, 2001.

On April 30, 2001, Mr. Webb sent a copy of the '144 patent to Wayne Geyer of STI and offered STI a license under the '144 patent. Pl.'s Ex. 15. In May 2001, Mr. Webb and Mr. Geyer discussed the possibility of a license agreement. Mr Geyer informed Mr. Webb in this conversation that STI's Board of Directors would consider U-Fuel's proposal. Testimony of Mr. Geyer, July 23, 2002, Hearing Tr. at 76-77. There was, however, no further contact between the parties regarding U-Fuel's licensing offer. Nevertheless, U-Fuel delayed initiating the present patent infringement action until May 7, 2002.

For purposes of plaintiff's Motion for a Preliminary Injunction, plaintiff proceeds on only one of claims set forth in the '144 patent, Claim 27. Claim 27 is a method claim – a claim which is not tied to a particular device, but is a series of steps that are performed to transform materials to a "different state or thing." Schumer v. Lab. Computer Sys., Inc., 2002 WL 31374850, *7 (Fed. Cir. Oct. 22, 2002). That claim provides as follows:

> A method of making a noninsulated above-ground fire-resistant storage tank for storing combustible material such as gasoline, comprising steps of:
> (a)    providing a plurality of sheet steel pieces having a composition, each of said sheet steel pieces having a minimum thickness;
> (b)    assembling and welding the sheet steel pieces into joints with at least one weld metal to form a storage tank; and
> (c)    installing at least fitting on the storage tank; and wherein the configuration of said joints, the composition and thickness of

---

[6] In the interview summary with representatives of U-Fuel, the Examiner recommended that U-Fuel amend its "independent claims to specify a non-insulated ground fire-resistant storage tank" and "discuss the applied prior art in this light," and noted that "the UL standards are for insulated tanks." Interview Summary, Patent Examiner Clifford Shaw, August 23, 2000.

said sheet steel pieces and the composition of the weld metal are
selected and combined such that the storage tank is able to
withstand an environment of at least 2000 degrees F. for a period of
time of at least two hours.

## IV.    CONCLUSIONS OF LAW AND DISCUSSION

### A.    Standard of Review

To obtain a preliminary injunction the moving party must establish that: "(1) it has a
reasonable likelihood of succeeding on the merits; (2) it will suffer irreparable harm if the
injunction is not granted; (3) the balance of hardships tips in its favor; and (4) an injunction would
be consistent with the public interest." Helifix Ltd. v. Blok-Lok, Ltd., 208 F.3d 1339, 1350-51
(Fed. Cir. 2000). A movant cannot be granted a preliminary injunction unless, at a minimum, it
establishes the first two factors, i.e., likelihood of success on the merits and irreparable harm.
Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc., 141 F.3d 1084, 1088 (Fed. Cir. 1998).

In order to demonstrate a likelihood of success on the merits, U-Fuel must show that, in
light of the presumptions and burdens at trial on the merits, (1) U-Fuel will likely prove that
defendants infringe the '144 patent, and (2) U-Fuel's infringement claim will likely withstand
defendants' challenges to validity and enforceability of the '144 patent. Genentech, Inc. v. Novo
Nordisk, A/S, 108 F.3d 1361, 1364 (Fed. Cir. 1997). Although U-Fuel's '144 patent is presumed
valid under 35 U.S.C. § 282,[7] the presumption does not relieve U-Fuel of its burden of
demonstrating likelihood of success on the merits of all disputed issues, even when the issue
concerns the patent's validity. New England Braiding Co., Inc. v. A.W. Chesterton Co., 970 F.2d

---

[7] Section 282 provides, in pertinent part, as follows: "A patent shall be presumed valid...
The burden of establishing invalidity of a patent or any claim thereof shall rest on the party
asserting it."

-9-

878, 882 (Fed. Cir. 1992) (citing <u>Nutrition 21 v. United States</u>, 930 F.2d 867, 869 (Fed. Cir.

1991)).

    If a defendant raises a substantial question concerning validity, *i.e.*, asserts an invalidity

defense that a plaintiff cannot prove "lacks substantial merit," a preliminary injunction will not

issue. <u>Genentech</u>, 108 F.3d at 1364. Indeed, "in resisting a preliminary injunction...[defendants]

need not make out a case of actual invalidity. Vulnerability is the issue at the preliminary

injunction stage, while validity is the issue at trial. The showing of a substantial question as to

invalidity thus requires less proof then the clear and convincing showing necessary to establish

invalidity itself." <u>Amazon.com, Inc. v. Barnesandnoble.com., Inc.</u>, 239 F.3d 1343, 1359 (Fed.

Cir. 2001).

    **B.**    **Claim Construction**

    The parties dispute the construction of Claim 27's phrase "selected and combined such

that the storage tank is able to withstand an environment of at least 2000 degrees F. for a period

of time of at least two hours." Specifically, they disagree as to the significance and construction

of the terms "selected and combined." U-Fuel argues that these terms distinguish Claim 27 from

prior art in that they necessarily entail an intent to build a tank that is "fire-resistant." Defendants

dispute plaintiff's construction, asserting that there is no such intent limitation attached to these

terms.

    The "first step" of an invalidity analysis based on anticipation in view of prior art is

determining the claim's meaning and scope. <u>See</u> <u>Lemelson v. Gen. Mills, Inc.</u>, 968 F.2d 1202,

1206 ("It is elementary in patent law that, in determining whether a patent is valid and, if valid,

infringed, the first step is to determine the meaning and scope of each claim in suit."). "A claim

must be construed before determining its validity just as it is first construed before deciding

infringement." Markman v. Westview Instruments, Inc., 52 F.3d 967, 996 n. 7 (Fed. Cir. 1995),

aff'd, 517 U.S. 370, 116 S.Ct. 1384 (1996).  "Only when a claim is properly understood can a

determination be made whether...the prior art anticipates and/or renders obvious the claimed

invention." Amazon.com, 239 F.3d at 1351.

In construing the meaning and scope of a claim, the Court can consider two types of

evidence: intrinsic and extrinsic.  Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed.

Cir. 1996). There are three sources of intrinsic evidence: (a) the words of the claims themselves;

(b) the specification, which is the written description of the claims including a description of the

preferred embodiment of the protected invention; and (c) the prosecution (or file) history of the

patent, if it is in evidence.  Id.  "Extrinsic evidence is that evidence which is external to the patent

and file history," such as expert testimony and prior art.  Id. at 1584.  It is only to be considered if

the analysis of intrinsic evidence alone will not resolve any ambiguity in a disputed claim term.  Id.

at 1583.

In considering intrinsic evidence, the Court must look first to the claim language itself to

define the scope of the protected invention.  Bell Atlantic Network Servs., Inc. v. Covad

Communications Group, Inc., 262 F.3d 1258, 1267 (Fed. Cir. 2001).  Claim terms are to be given

their plain and ordinary meaning unless it is apparent from the patent specification that the

inventor intended a different meaning.  Nat'l Recovery Techs., Inc. v. Magnetic Separation Sys.,

Inc., 166 F.3d 1190, 1195 (Fed. Cir. 1999).

U-Fuel contends that the language "selected and combined" instructs one skilled in the art

to select and combine materials with the intent of manufacturing a non-insulated AST that can

withstand a 2000 degree Fahrenheit environment for two hours.  U-Fuel argues that the words "selected and combined" necessarily incorporates an "intent" limitation – a limitation that U-Fuel notes is neither in the UL 142 standard nor the F921 specifications – thereby distinguishing its claim from prior art.  Defendants dispute this construction and assert that there is no intent element in Claim 27 that makes this process claim new.

To support its interpretation that the terms "selected and combined" embody an "intent-to-achieve-fire-resistance" limitation, U-Fuel cites two cases, Nat'l Recovery Techs., Inc. v. Magnetic Separation Sys., Inc., 166 F.3d 1190 (Fed. Cir. 1999), and Optical Coating Laboratory, Inc. v. Applied Vision, Ltd., 1996 WL 53631, No. C-92-4689 MHP (N.D. Cal. January 19, 1996).  The Court concludes that these decisions are inapposite to the construction of plaintiff's method claim at issue in this case, Claim 27.

Although Nat'l Recovery and Optical Coating both involved the disputed construction of the term "select" in method claims, that is where the similarity to the present case ends.  Those cases never addressed the issue of whether the plain and ordinary meaning of the term "select" to one of ordinary skill in the art includes the intent of achieving an objective for the purpose of distinguishing a claim from prior art.  In other words, the courts in these cases were not faced with the question of whether an intent limitation is attached to the term "select" to prevent prior art anticipation, nor did they in fact conclude that this term incorporates such an intent element.

The dispute in Nat'l Recovery centered around whether the term "select" merely stated a preference for certain radiation signals that did not pass through plastic containers or required "perfect isolation" between those signals that passed and those that did not pass.  That case did not address the question presented in this case – whether the term "select" incorporated an intent

-12-

limitation.  In <u>Optical Coating</u>, the crux of the controversy was whether two distinct processes of

applying protective films to optical lenses was incorporated in the term "select," not whether this

term included an intent limitation.

Moreover, an argument of claim construction similar to that made by U-Fuel was rejected

in <u>In re Cruciferous Sprout Patent Litigation</u>, 168 F. Supp. 2d 534 (D. Md. 2001), <u>aff'd</u>, 2002

WL 1917373, No. 02-1031, (Fed. Cir. Aug. 21, 2002).  Plaintiffs in that case discovered that

certain cruciferous sprouts, such as broccoli and cauliflower, contained higher levels of cancer-

prevention properties than other cruciferous seeds, such as cabbage or radish.  <u>Id.</u> at 538.

Plaintiffs patented a method of preparing food products by "identifying" those seeds which

produce cruciferous sprouts high in cancer-prevention properties, germinating said seeds, and

harvesting them for consumption.  <u>Id.</u> at 536.  Defendants argued that the claim described nothing

more than germinating sprouts from certain cruciferous seeds and harvesting those sprouts as a

food product, a process known long before the application of the plaintiff's patent.  <u>Id.</u> at 537.

The court agreed with the defendants and rejected plaintiff's argument that the claim language

"'identifying seeds which produce cruciferous sprouts...containing [the desired anti-cancer

properties]' introduce[d] a new 'selection' step that was not part of the prior art."  <u>Id.</u> at 540.  It

held that this "selection" step merely entailed "choosing to do one thing over another [–] choosing

to grow broccoli or cauliflower sprouts instead of [other sprouts]"– and concluded that "[a]ny

process could be prefaced by a similar 'selection' step" and that being the first to "perform a

particular process cannot be enough to make the process 'new'."  <u>Id.</u>

In construing a claim, the "claim terms are to be given their ordinary meaning unless it is

apparent that the inventor intended to use them differently."  <u>Nat'l Recovery</u>, 166 F.3d at 1195.

In this case, there is nothing in the '144 patent's specification or prosecution history which tracks the "selected and combined" language of Claim 27 and which provides any indication that these terms necessarily entail an intent-to-achieve-fire-resistance limitation. Furthermore, in giving the term "selected and combined" its ordinary meaning to one of ordinary skill in the art, there is no such intent limitation. Thus, U-Fuel's argument that there is an intent element inherent in the term "selected and combined" must be rejected. The Court concludes that in construing the claim at issue on the present state of the record, there is no intent limitation on the term "selected and combined;" U-Fuel's method claim, as construed by the Court, describes nothing more than building a non-insulated AST that has fire-resistant properties for the use of storing combustible and flammable materials such as gasoline.

The Court notes that for purposes of plaintiff's motion, its construction of Claim 27, in particular the terms "selected and combined," is a tentative one. The Court is not required to interpret Claim 27 "conclusively and finally" when deciding a motion for preliminary injunction. Sofamor Danek Group, Inc. v. DePuy-Motech, Inc., 74 F.3d 1216, 1221 (Fed. Cir. 1996) (stating that a trial court is "not obligate[d] ... to conclusively interpret claims at an early stage in a case" and "may exercise its discretion to interpret the claims at a time when the parties have presented a full picture of the claimed invention and prior art"). Furthermore, findings and conclusions as to claim construction at the preliminary injunction stage are not binding at trial. See Int'l Communication Materials, Inc. v. Ricoh Co., 108 F.3d 316, 318-19 (Fed. Cir. 1997) (holding that a district court did not abuse its discretion in denying a preliminary injunction based on a "tentative claim construction," given that there were "substantial open issues and questions that must be litigated before a finding of infringement can be made, including claim construction...");

-14-

Illinois Tool Works, Inc. v. Grip-Pak, Inc., 906 F.2d 679, 681 (Fed. Cir. 1990) (affirming a district court's denial of a preliminary injunction "after a hearing in which neither party was required to prove his case in full and in light of findings and conclusions not binding at trial") (emphasis in original).

> ### C.    Likelihood of Success on the Merits: The Validity of Claim 27

In defense of its "Flameshield" tanks, defendants assert, inter alia, that the '144 patent and Claim 27 are invalid based on prior art.  Specifically, they contend that the F921 tank and other double wall, non-insulated ASTs manufactured and sold more than one year prior to the filing of U-Fuel's application of the '842 patent on January 17, 1996,[8] anticipated U-Fuel's reissued '144 patent.  Further, defendants argue that the "Flameshield" tank is identical to the F921 tank. Defendants contend that they have been "selecting and combining" steel and joints in the assembly of their ASTs in the same way today as they did prior to the critical date; that there has been no change in the manufacturing processes of their double wall, non-insulated ASTs, now labeled "Flameshield," since the F921 tanks were first sold to the public prior to the critical date. Hearing Tr., July 24, 2002, at 34-35.

U-Fuel counters by highlighting the fact that the "Flameshield" 2001 specifications have grown in size from the pre-critical date F921 specifications[9] and that the "carbon equivalency"

---

[8] The one-year-prior date is referred to as the "critical date."  In the Court's determination of whether prior art anticipated U-Fuel's '144 reissued patent, January 17, 1995 is the critical date because U-Fuel applied for its original '842 patent on January 17, 1996.  See, e.g., 35 U.S.C. §102(b) (stating that a patent is invalid as anticipated if the claimed invention "was patented or described in a printed publication in this or a foreign country or in public use or on sale in the country, more than one year prior to the date of application for patent in the United States").

[9] STI's F921 specifications pre-critical date was 14 pages.  Pl.'s Ex. 35.  STI's "Flameshield" 2001 specification is 67 pages.  Pl.'s Ex. 39.

formula has changed.  Pl.'s Ex. 54.  However, these changes, including the carbon equivalency

formula, were global; they were applied to all of STI's above-ground and underground tank

technologies.  Testimony of Laurie Grainawi, July 25, 2002, at 22-24.  Moreover, although the

"Flameshield" specification is more lengthy and includes much material not in the F921

specification,[10] the changes did not affect the process – selection of steel and thickness used, the

type of joints, and the method of welding – in which defendants' non-insulated ASTs were

manufactured prior to the critical date.  Id. at 25.

    Based on the evidence submitted by Highland and Modern the Court agrees with

defendants and concludes that their non-insulated ASTs made prior to the critical date were

manufactured in the same way that the "Flameshield" tanks are manufactured today.  Testimony

of Charles A. Frey, July 24, 2002, at 12-20; Defs.' Ex. 32 - 42; Testimony of Jerry L. Waller, July

24, 2002, Stipulation Of Parties, ¶ 2; Testimony of Messrs. Larry O'Shea and Duane Hazelwood,

Stipulations Of Parties, ¶ 4.

    U-Fuel argues that even if the terms "selected and combined" do not embody the intent to

pass a fire-resistance test, and that Claim 27 was a manufacturing process known to defendants

prior to the critical date, Claim 27 is still valid because it is a "new use" of a known process – the

"new use" of being an AST that is not insulated, and yet capable of being listed as "fire-resistant"

---

[10] Defendants assert, and plaintiff's do not dispute, that most of the increase made in the
"Flameshield" specification included material set forth previously in stand-alone documents, such
as UL 142 and dike-design standards.  Pl.'s Ex. 39, Appendices B, D, and F.

under NFPA 30A[11] – and thus, patentable under 35 U.S.C. §101[12] and 35 U.S.C. 100(b).[13]  A certified "fire-resistant" AST, U-Fuel claims, can be put to "new uses" for which an AST not so labeled could not be utilized under Section 1-1.1. of NFPA 30A.

In response to plaintiff's "new use" contention, defendants argue that method Claim 27 simply describes an old use, anticipated by prior art, and is not patentable.  They assert that "fire-resistance" is an inherent feature of their pre-critical date ASTs and the fact that a non-insulated AST can currently be labeled as "fire-resistant" is merely a result of a new fire standard, SwRI 97-04, and nothing more.  Indeed, the only development that can be considered "new," according to defendants, is the SwRI 97-04 protocol, not Claim 27.  Defendants also argue that the use of ASTs has always been the same – to store combustible and flammable materials; the only use actually recited in Claim 27.

Defendants have also raised the following defenses to the validity and enforcement of the '144 patent: (1) Claim 27, as construed by U-Fuel to broadly cover steel, thickness, and weld joints other than those expressed in the patent specification, violates the written description requirement of 35 U.S.C. § 112, which mandates that a patent specification must clearly allow those skilled in the art to recognize what is claimed; (2) there is no evidence that defendants were infringing any claims of the original, and now surrendered, '842 patent, and defendants' allegedly

---

[11] The Court notes that NFPA 30A is not mentioned anywhere in the reissued '144 patent.

[12] 35 U.S.C. §101 provides: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor...."

[13] 35 U.S.C. §100(b) defines the term "process" as a "process, art or method, and includes a new use of a known process, machine, manufacture, composition of matter, or material."

infringing activities conducted prior to the reissuance of the '144 patent are protected under the "intervening rights" provision of 35 U.S.C. § 252, which provides that third parties may continue to manufacture infringing products where substantial preparation was made before the grant of a reissued patent; (3) Mr. Webb, the inventor of the '144 patent and U-Fuel's president, violated the requirement of disclosing the "best mode" for making a fire-resistant AST; (4) conflicting testimony of Mr. Webb in the Texas trade secret action and the preliminary injunction hearing in this case demonstrates U-Fuel's "unclean hands"; and (5) plaintiff's "inequitable conduct" in procuring the '144 patent by failing to correct the Patent Examiner's mistaken belief that the UL standards applied only to insulated tanks.

For the reasons set forth below, the Court concludes on the present state of the record that U-Fuel's method claim is inherently anticipated by defendants' prior art and is thus invalid. Accordingly, the Court need not address defendants' other defenses to plaintiff's motion.

New uses of known processes may be patentable, see 35 U.S.C. §101 ("Whoever invents or discovers any new and useful process...may obtain a patent therefor."); 35 U.S.C. §100(b) ("The term 'process' means process, art or method, and includes a new use of a known process, machine, manufacture, composition of matter, or material."), provided that the new use is new and is not anticipated by prior art. See 35 U.S.C. §102(b) (stating that a patent is invalid as anticipated if the claimed invention "was patented or described in a printed publication in this or a foreign country or in public use or on sale in the country, more than one year prior to the date of application for patent in the United States"). An anticipation analysis involves a comparison of the claim, as construed, to the prior art. Helifix, 208 F.3d at 1346. "To invalidate a patent by anticipation, a prior art reference normally needs to disclose each and every limitation of the

-18-

claim." Atlas Powder Co. v. IRECO Inc., 190 F.3d 1342, 1347 (Fed. Cir. 1999).

However, "a prior art reference may anticipate when the claim limitation or limitations not expressly found in that reference are nonetheless inherent in it." MEHL/Biophile Int'l Corp. v. Milgraum, 192 F.3d 1362, 1365 (Fed. Cir. 1999). Under the principles of inherency, if the prior art necessarily functions in accordance with, or includes, the limitations of a method or process claim, it anticipates the claim. In re King, 801 F.2d 1324, 1326 (Fed. Cir. 1986). "Inherency is not necessarily coterminous with the knowledge of those of ordinary skill in the art. Artisans of ordinary skill may not recognize the inherent characteristics or functioning of the prior art." MEHL/Biophile, 192 F.3d at 1365; In re Cruciferous, 168 F. Supp. 2d at 538 ("It is important to note that a property or result can be inherent in prior art regardless of whether those skilled in the art were previously aware of that property or result.").

In Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc., 246 F.3d 1368 (Fed. Cir. 2001), Bristol-Myers owned two patents that claimed therapeutic methods of employing a three-hour administration of the anti-cancer drug paclitaxel. Id. at 1371. The district court found the claims to be anticipated inherently by prior art – a scientific article describing experiments involving the same methodologies in the patent but observing no anti-tumor response. Id. at 1373. On appeal, Bristol-Myers argued that because the claims included such phrases as "for reducing hematologic toxicity," the claims required "efficacy" in tumor treatment, thus avoiding anticipation because the prior art contained no reference to such efficacy. Id. at 1374. The Federal Circuit disagreed and affirmed the district court's ruling. Because the actual method stated in the claims – treating cancer patients with three-hour infusions of paclitaxel within the claim dosages – was described in the scientific article, the court held that expressions of anti-tumor efficacy did not distinguish the

-19-

claimed method from this prior art.  Id. at 1376.  The court concluded that Bristol-Myers's claims did not involve a new use of an old process because "the claimed process here is not directed to a new use; it is the same use, and it consists of the same steps as described by [the prior art reference.]."  Id.  The court dismissed Bristol-Myers's argument that the intended anti-tumor results were not specifically mentioned in the prior reference, concluding that "[n]ewly discovered results of known processes directed to the same purpose are not patentable because such results are inherent."  Id. at 1376 (emphasis added).  The Federal Circuit thus determined that the tumor reduction aspect of the claimed method was inherent in the prior art.

Furthermore, the Federal Circuit in In re Cruciferous, 2002 WL 1917373, in affirming the district court decision discussed above, noted that the plaintiff did not invent a new kind of sprout, or a new way of growing or harvesting sprouts.  Id. at *5.  Rather, the plaintiff, according to the Federal Circuit, simply recognized that some sprouts were rich in cancer-prevention properties while other sprouts were not.  Id.  That court stated that these properties "necessarily have existed as long as sprouts themselves" and were inherent characteristics of these sprouts.  Id. It disagreed with plaintiff's argument that plaintiff's claims were not anticipated because prior art did not disclose "selecting the particular seeds that will germinate as sprouts rich in [anti-cancer properties] (as opposed to selecting other kinds of seeds to sprout) in order to form a food product," id. at *6, and instead held that it is "unnecessary for purposes of anticipation for the persons sprouting these particular [seeds] to have realized that they were sprouting something rich in [cancer-prevention properties]."  Id. at *7.  The Federal Circuit concluded that "[w]hile [plaintiff] may have recognized something about sprouts that was not known before, [plaintiff's] claims do not describe a new method."  Id. at *8.

-20-

Similarly, the claim at issue in Titanium Metals Corp. of Am. v. Banner, 778 F.2d 775 (Fed. Cir. 1985), involved a titanium based alloy that was "characterized by good corrosion resistance in hot brine environments." Id. at 776. Prior art disclosed a titanium based alloy having the recited components of the claim, but it did not disclose that the alloy had corrosion-resistant properties. Nevertheless, the Federal Circuit held that the claim was anticipated by the prior art, because "it is immaterial, on the issue of their novelty, what inherent properties the alloys have or whether these applicants discovered certain inherent properties." Id. at 782. In discussing 35 U.S.C. §101, the court stated that "Congress has not seen fit to permit the patenting of an old alloy, known to others through a printed publication, by one who has discovered its corrosion resistance or other useful properties ..." Id.

Similar to Bristol-Myers, In re Cruciferous, and Titanium Metals, U-Fuel's claim merely recited a "newly discovered result" or inherent characteristic – fire-resistance – of a known method – manufacturing non-insulated ASTs – directed to the same purpose – storing combustible and flammable materials. Therefore, although in appropriate cases a court is instructed to construe claims so as to preserve their validity, Wang Labs., Inc. v. Am. Online, Inc., 197 F.3d 1377, 1383 (Fed. Cir. 1999), the expression "such that the storage tank is able to withstand an environment of at least 2000 degrees F. for a period of time of at least two hours" in Claim 27 describes only a result and does not impart patentability to Claim 27. U-Fuel has done nothing more than recognize properties inherent in prior art, just like the anti-tumor properties in paclitaxel infusions in Bristol-Myers, the cancer-prevention properties inherent in sprouts in In re

Cruciferous, and the corrosion-resistant properties inherent in an alloy in Titanium Metals.[14]  It was only through a new standard of testing tanks for fire-resistance – the SwRI 97-04 protocol – and not through some new technology or methodology in manufacturing non-insulated ASTs, that U-Fuel was able to "discover" that these ASTs could be certified as fire-resistant.

It is of no import that the non-insulated ASTs manufactured by defendants were not marketed as "fire-resistant" until the introduction of SwRI 97-04.  Indeed, the only performance test in existence one year prior to the critical date was the UL 2085 test and no non-insulated AST, regardless of the manufacturer, could pass that test and be characterized as "fire-resistant" pursuant to NFPA 30A.  Although U-Fuel may have been the first to persuade the tank industry that non-insulated ASTs could be certified as fire-resistant if they were to undergo a different performance test, i.e., one that does not have internal temperature requirements, it cannot patent the newly-disclosed results of that test.

To support its contention that the method claim is a new use not anticipated by prior art, U-Fuel relies on In re Zierden, 411 F.2d 1325 (C.C.P.A. 1969); the Court concludes that decision is inapposite to the instant case.  In Zierden, the claims at issue were for a composition (insoluble potassium metaphosphate and a solubilizing agent therefore) and method useful for removing and preventing alluvium deposits in water systems derived from natural systems, such as rivers, ponds, lakes, or other sources of "impure natural waters," such as industrial cooling systems.  Id. at 1326.  The prior art was a French patent which disclosed the treatment of "industrial waters" used

---

[14] Although the claim at issue here is a method claim, Titanium Metals is applicable even though that case involved a composition claim.  See In re Cruciferous, 2002 WL 1917373 at *8 n.4 ("Most of the claims at issue are method claims, not composition or product claims. Nevertheless, the principles of Titanium Metals still apply.").

in industrial heating and cooling systems with the same composition, but for the purpose of preventing the deposition of scale in such systems. Id. at 1327. The prior art did not disclose that alluvium was present in "industrial waters" and did not suggest that alluvium, as well as scale deposition, from industrial waters can be removed and prevented by adding the composition. Id.

The court in Zierden found the composition claim, distinguishable only by the intended use in the claim – the removal of alluvium deposits – unpatentable, holding that a "mere statement of a new use for an otherwise old or obvious composition cannot render a claim to the composition patentable." Id. at 1328. However, the court also held that the method claim was not anticipated by prior art because the purpose of removing alluvium was a limitation on the claim. The court determined that (1) the term "water systems" contained in the claim language must be read as a claim limitation that the "water systems contained alluvium;" and (2) there was nothing in the record that the water systems in the prior art contained alluvium or that its presence was contemplated. Id. at 1331. As such, the Zierden court concluded that alluvium removal was not an inherent characteristic of the composition and thus ruled that the process, as claimed, was not anticipated by prior art. Id.

In the instant case, however, the intended purpose of the prior art and U-Fuel's patented process, as claimed, is the same – storing combustible and flammable materials such as gasoline. If Claim 27 patented a process of building a non-insulated AST for use in storing drinking water, Zierden would be apposite. In that scenario, while both the prior art and the patented process involve the building of a non-insulated AST – just as both the prior art and the patented process in Zierden involved using a potassium composition to treat water systems – the intended use of the prior art (storing combustible materials) and the intended new use of the patented process (storing

-23-

drinking water) is distinguishable – just as the intended use of the prior art in <u>Zierden</u> (removing

scale deposits) and the intended new use of the patented process (removing suspended alluvium)

is distinguishable.

A hypothetical set forth in <u>Catalina Marketing Int'l, Inc. v. Coolsavings.com, Inc.</u>, 289

F.3d 801 (Fed. Cir. 2002), best illustrates the concept of the patentability of a new method of a

known process that is used for a new purpose, and provides clarification of the admittedly subtle,

yet critical, difference between <u>Zierden</u> and the dispute in this case:

> Inventor A invents a shoe polish for shining shoes (which, for the sake
> of example, is novel, useful, and nonobvious).  Inventor A receives a
> patent having composition claims for shoe polish.  Indeed, the preamble
> of these hypothetical claims recites "a composition for polishing
> shoes."... Inventor B could not secure claims on the method of using the
> composition for shining shoes because the use is not a "new use" of the
> composition but, rather, the same use of shining shoes... (citations
> omitted) ... Suppose Inventor B discovers that the polish also repels
> water when rubbed onto shoes.  Inventor B could not likely claim a
> method of using the polish to repel water on shoes because repelling
> water is inherent in the normal use of the polish to shine shoes...
> (citations omitted) ... In other words, Inventor B has not invented a
> "new" use by rubbing polish on shoes to repel water.  Upon discovering,
> however, that the polish composition grows hair when rubbed on bare
> human skin, Inventor B can likely obtain method claims directed to the
> new use of the composition to grow hair. <u>Id.</u> at 809-810.

U-Fuel's attempt to claim a method of building non-insulated ASTs that are also fire-

resistant is analogous to Inventor B's unsuccessful attempt to claim a method of using shoe polish

to repel water.  The normal use of non-insulated ASTs in both the prior art and U-Fuel's claim is

to store combustible materials, just as the normal use of polish for Inventor A and Inventor B is to

shine shoes.  Fire-resistance is an inherent property of the non-insulated ASTs when used for the

purpose of storing combustible materials, just as the repelling of water is an inherent property of

the polish when used to shine shoes.  See, e.g., In re King, 801 F.2d at 1326 ("'[I]f a previously

patented device, in its normal and usual operation, will perform the function [claimed] in a

subsequent [] process patent, then such [] process patent [is] ... anticipated by the former patented

device.'") (quoting In re Ackenbach, 45 F.2d 437, 439 (C.C.P.A. 1930); see also In re Woodruff,

919 F.2d 1575, 1577 (Fed. Cir. 1990) (rejecting the argument that applicant's method claim of

inhibiting the growth of fungi on fresh vegetables should be given a "purpose limitation" –

requiring that one be intending to inhibit fungal growth – to prevent anticipation by prior art

which involved similar methodologies but was used for retarding deterioration generally without

recognizing the fungi-inhibiting property of applicant's method).

In both Claim 27 and prior art, the *same* purpose – storing combustible and flammable

materials – is claimed.  The only difference between U-Fuel's claim and prior art is the newly-

disclosed "benefit" of fire-resistance (the result of a new testing protocol, and not the result of any

new technology or methodology), a difference that does not render U-Fuel's claimed process

patentable.  Accordingly, for all of the above reasons, the Court concludes on the present state of

the record that defendants have successfully raised a substantial question as to the validity of U-

Fuel's reissued '144 patent.[15]  Therefore, U-Fuel has not demonstrated a likelihood of success on

the merits.

**D.    Irreparable Harm**

The second factor a party must establish in order to obtain a preliminary injunction is that

---

[15] At this preliminary injunction stage, the Court does not completely resolve the validity
question.  Actual validity is the issue at trial.  See Amazon.com, 239 F.3d at 1359.  The Court
acknowledges that its analysis of the '144 patent's validity, for purposes of plaintiff's motion, was
made without all the evidence that may be presented at the Markman hearing and at trial.  See
New England Braiding, 970 F.2d at 882-83.

it will suffer irreparable harm if the preliminary injunction is not granted. U-Fuel asserts that if defendants are not preliminary enjoined from their current activities, U-Fuel will no longer be able to continue licensing its technology, thereby preventing U-Fuel from establishing a strong domestic market presence as a licensor in the fuel storage tank industry. U-Fuel also claims that if its patent goes unprotected, it will lose the right to exploit its patent altogether. The Court is not convinced by U-Fuel's argument.

A presumption of irreparable harm will arise where the patentee has made a clear showing of patent validity and infringement. Amazon.com, 239 F.3d at 1350; Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys., 132 F.3d 701, 708 (Fed. Cir. 1997). As previously discussed, a substantial question has been raised as to the validity of the reissued '144 patent; that conclusion deprives U-Fuel of the presumption. See Nutrition 21 v. United States, 930 F.2d 867, 871 (Fed. Cir. 1991) ("[W]ithout a clear showing of validity and infringement, a presumption of irreparable harm does not arise in a preliminary injunction proceeding.") (emphasis in original). That requires the Court to consider two factors relevant to an irreparable harm inquiry: delay by the patent holder in seeking injunctive relief and the effectiveness of money damages to compensate a party for market loss.

In its analysis of irreparable harm in a patent case, a court can consider the period of delay exercised by a party prior to seeking a preliminary injunction. See Hybritech Inc. v. Abbott Labs., 849 F.2d 1446, 1457 (Fed. Cir. 1988). In the instant case, U-Fuel learned about the allegedly infringing activities as early as July 15, 1999, when U-Fuel notified SwRI that the SwRI 97-04 testing and certification of other tanks of U-Fuel's "competitors," including STI, conflicted

with U-Fuel's original '842 patent.[16]  STI issued a press release reporting that its Board of

Directors had authorized the "Flameshield" program on November 21, 1999, and that members

could officially begin marketing "Flameshield" tanks in early 2000.  Defs.' Ex. 22.  U-Fuel,

however, did not file its motion for a preliminary injunction until May 9, 2002.

To explain this delay in seeking injunctive relief, U-Fuel contends that Claim 27 was not in

the original '842 patent.  Although Claim 27 was not in the original '842 patent, and is the only

claim asserted for purposes of U-Fuel's Motion for a Preliminary Injunction, U-Fuel still alleges,

in the motion, that defendants' "Flameshield" tanks infringed Claims 1 and 3 of the reissued '144

patent, which are identical to Claims 1 and 3 in the original '842 patent.  In this regard, U-Fuel

provides no adequate explanation why it could not have sought injunctive relief against defendants

based on the alleged infringement of Claims 1 and 3 in the '842 patent when STI unveiled its

"Flameshield" program to the public in late 1999 or why it did not act to protect its '842 patent

when U-Fuel learned about SwRI's testing activities in July of 1999.

U-Fuel also argues that its delay is attributable to a trade secret action against SwRI in

Texas.  U-Fuel claims that because it was involved in this expensive, out-of-state litigation, it

could not afford to simultaneously litigate the present dispute.  However, U-Fuel fails to explain

why it chose to delay bringing suit on its original '842 patent or why it decided to proceed with

the trade secret litigation against SwRI, a non-competitor of U-Fuel, instead of proceeding with a

patent infringement suit against its competitors in the tank industry.

Finally, U-Fuel asserts that its delay was due, in part, to STI's failure to timely respond to

---

[16] See also Testimony of John Knoble, July 22, 2002, at 220-221 (opining that Claims 1
and 3 of the original '842 patent were infringed as of July 1999).

U-Fuel's offer to license its technology immediately upon the re-issuance of the '144 patent on

April 24, 2002.  On April 30, 2001, U-Fuel contacted STI offering a license under the '144

patent.  Pl.'s Ex. 15.  The two parties discussed the licensing proposal in May 2001, but STI

decided not to respond to U-Fuel's offer and there was no further contact between the parties

regarding a licensing agreement.  To explain its delay U-Fuel says it patiently waited for a

response from STI that never came.  The Court finds this explanation unpersuasive.  In fact, U-

Fuel's attempt to license its patent to STI cuts against its argument that it will suffer irreparable

harm.

      In addressing the issue of irreparable harm, the Court must determine whether money

damages are sufficient to compensate plaintiff.  Not only is U-Fuel's attempt to license its patent

to defendants (and delay in seeking injunctive relief) incompatible with the right to exclude and

exploit a patent, see T.J. Smith & Nephew Ltd. v. Consolidated Med. Equip., Inc., 821 F.2d 646,

648 (Fed. Cir. 1987) ("...[Plaintiff's] delay in seeking an injunction and by its grant of licenses

[are] acts incompatible with the emphasis on the right to exclude that is the basis for the

presumption [of irreparable harm] in a proper case."), its licensing offer to defendants in April

2001 suggests that any injury suffered by U-Fuel is compensable in money damages, obviating the

need for injunctive relief.  See High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.,

49 F.3d 1551, 1557 (Fed. Cir. 1995) ("[T]he evidence shows that [plaintiff] offered a license to

[defendant], so it is clear that [plaintiff] is willing to forgo its patent rights for compensation.

That evidence suggests that any injury suffered by [plaintiff] would be compensable in damages

assessed as part of the final judgment in the case.").

      For the foregoing reasons, the Court concludes that U-Fuel has not shown that it will

-28-

suffer irreparable harm if the preliminary injunction is denied.


**V.    CONCLUSION**

Defendants have raised a substantial question as to the validity of the '144 patent based on anticipation of prior art on the present state of the record. Moreover, by its delay in seeking injunctive relief and its attempt to license the '144 patent to STI, U-Fuel has failed to demonstrate irreparable harm. Therefore, the first two requirements for a preliminary injunction have not been met, and the Court denies plaintiff's Motion for a Preliminary Injunction.[17]

An appropriate order follows.

---

[17] See Vehicular Techs., 141 F.3d at 1088 ("[Plaintiff must] establish *both* of the first two factors, i.e., likelihood of success and irreparable harm, to receive a preliminary injunction.") (emphasis in original).

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

---

**U-FUEL, INC. (NV)**                         :

        **Plaintiff,**                 :

    **v.**                                 :      **CIVIL ACTION**

                                    :

**HIGHLAND TANK &**                          :
**MANUFACTURING COMPANY, INC.,**             :
**STEEL TANK INSTITUTE, and**                :
**MODERN WELDING COMPANY OF**                :
**OHIO, INC.**                               :      **NO. 02-2723**

                                      :

        **Defendants.**                :

---

### ORDER

    **AND NOW**, this 4th day of November, 2002, upon consideration of Plaintiff's Motion for

a Preliminary Injunction and Expedited Discovery (Document No. 3, filed May 9, 2002), and the

related submissions of the parties, following a hearing on July 22 through 25, 2002, for the

reasons set forth in the attached Memorandum, **IT IS ORDERED** that plaintiff's Motion for a

Preliminary Injunction and Expedited Discovery is **DENIED**.

.

                               **BY THE COURT:**

                               _____

                               **JAN E. DUBOIS, J.**